UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
-----------------------------------------------------------------------X
ALEXANDRA BEER,

                        Plaintiff,

HOME CARE ASSOCIATES OF PHILADELPHIA,
INC.; HOME CARE ASSOCIATES OF PHILADELPHIA,
INC. *d/b/a* HOME CARE ASSOCIATES; DONNA
JENKINS, *individually*; TASHA COOPER, *individually*;
SHAQUILA BENSON, *individually*; and AISHA (Last
Name Unknown), *individually*,

                        Defendants.
-----------------------------------------------------------------------X

Civil Action No.

**18 2640**

**COMPLAINT**

Plaintiff Demands a
Trial by Jury

Plaintiff, ALEXANDRA BEER, as and for her Complaint against the above Defendants respectfully alleges upon information and belief as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA")[1] and seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against on the basis of her disability, subjected to a hostile work environment on the basis of the same, and retaliated against by her employer for complaining of harassment and discrimination.

## JURISDICTION AND VENUE

---

[1] As Plaintiff's related claims under the Pennsylvania Human Relations Act ("PHRA") and the Philadelphia Fair Practices Ordinance ("PFPO") are not yet ripe, Plaintiff reserves the right to amend her Complaint to include those causes of action once they are available to her.

2. This action involves a Question of Federal Law under the Americans with Disabilities Act of 1990. This court has supplemental jurisdiction over the State and City causes of action.

3. Venue is proper in this district based upon the fact that Plaintiff was employed by Defendants within the County of Philadelphia, Commonwealth of Pennsylvania, within the Eastern District of Pennsylvania. Additionally, the events in issue took place in Philadelphia County, Pennsylvania within the Eastern District of Pennsylvania.

4. On or about December 20, 2017, Plaintiff dual-filed charges with the EEOC and PHRC against Defendants as set forth herein.

5. On or about March 26, 2018, the Equal Employment Opportunity Commission issued Plaintiff her Notice of Right to Sue.

6. This action is being commenced within 90 days of receipt of the EEOC Right to Sue Letter.

## PARTIES

7. Plaintiff ALEXANDRA BEER (hereinafter also referred to as Plaintiff and "BEER") is an individual female who is a resident of the Commonwealth of Pennsylvania.

8. At all times material, Defendant HOME CARE ASSOCIATES OF PHILADELPHIA, INC. was and is a domestic "B" Corporation duly licensed to do business within the Commonwealth of Pennsylvania.

9. At all times material, Defendant HOME CARE ASSOCIATES OF PHILADELPHIA, INC. used and continues to use HOME CARE ASSOCIATES as a registered fictitious name under which to do business within the Commonwealth of Pennsylvania.

10. At all times material, Defendant HOME CARE ASSOCIATES OF PHILADELPHIA, INC. and Defendant HOME CARE ASSOCIATES (hereinafter collectively "HOME CARE ASSOCIATES" or "HCA") were Plaintiff's joint and solo employers.

11. At all times material, Defendants operated an office located at 1500 Walnut Street, Suite 1000, Philadelphia, PA 19102.

12. At all times material, Defendant DONNA JENKINS (hereinafter "JENKINS") was an employee of Defendant HCA.

13. At all times material Defendant JENKINS was employed as a Scheduling Manager by Defendant HCA.

14. At all times material, Defendant JENKINS held direct supervisory authority over Plaintiff.

15. At all times material, Defendant TASHA COOPER (hereinafter "COOPER") was an employee of Defendant HCA.

16. At all times material, Defendant COOPER was employed by Defendant HCA as a Director.

17. At all times material, Defendant COOPER held supervisory authority over Plaintiff.

18. At all times material, Defendant SHAQUILA BENSON (hereinafter "BENSON") was an employee of Defendant HCA.

19. At all times material, Defendant BENSON was employed by Defendant HCA as a Scheduling Coordinator.

20. At all times material, Defendant BENSON held supervisory authority over Plaintiff.

21. At all times material, Defendant AISHA (Last Name Unknown) (hereinafter "AISHA") was an employee of Defendant HCA.

22. At all times material, Defendant AISHA was employed by Defendant HCA as a Scheduling Coordinator

23. At all times material, Defendant AISHA held supervisory authority over Plaintiff.

## MATERIAL FACTS

24. Around December 8, 2015, Plaintiff began working for Defendant HCA as a Home Health Aide.

25. At all times material from the beginning of her employment with HCA and continuing through the present day, Plaintiff has suffered and continues to suffer from several disabilities. Plaintiff has been diagnosed with Postural Orthostatic Tachycardia Syndrome ("POTS"), which she uses a pacemaker to help regulate. Plaintiff also has an intellectual disability.

26. POTS is a cardiologic condition that causes abnormal increases in heart rate, among other symptoms, and can cause blurred vision, trouble thinking, lightheadedness, and weakness.

27. At all times material since the start of Plaintiff's employment, Defendant HCA was fully aware of Plaintiff's disabilities. Plaintiff specifically informed HCA of such both during her training for her position and after the training was completed.

28. From the beginning of Plaintiff's employment, Defendant HCA's employees (including Plaintiff's supervisors) would regularly harass Plaintiff about her disabilities. By means of example only, Defendants BENSON and JENKINS would regularly tell Plaintiff that she was "**retarded**" and "**too slow**." Plaintiff's supervisors and coworkers would harass

Plaintiff in such a way on a daily basis, both in private and in front of other co-workers, in addition to making fun of Plaintiff's physical appearance.

29. Plaintiff also has a speech impediment as a result of her disability. On numerous occasions, Defendants would also harass Plaintiff about this, telling her that she "doesn't talk right" and to "talk better."

30. In addition to the above odious comments made directly to Plaintiff, Defendants would also tell Plaintiff's clients that she was "retarded."

31. Defendants' constant harassment about Plaintiff's disability was so pervasive that Plaintiff would cry at work on numerous occasions. When this would occur, her supervisors would typically tell Plaintiff that she "cries too much."

32. Plaintiff reported this harassment on multiple occasions, but whenever Plaintiff would attempt to report the harassment to her supervisor (Defendant COOPER), COOPER would dismiss Plaintiff's reports, telling her on several occasions that "Maybe this job just isn't for you" and "Maybe you can't handle this job."

33. Upon information and belief, neither COOPER nor any other of Defendants' employees ever investigated any of Plaintiff's reports. Furthermore, Plaintiff's Employee Handbook contains no provisions regarding procedures or instructions for reporting harassment or discrimination (aside from instructions on dealing with sexual harassment by a client), or even a telephone number for Human Resources, leaving Plaintiff with no other known options for reporting the unyielding, vicious harassment.

34. Furthermore, Defendants would also assign far fewer "cases" (and consequently, fewer hours) to Plaintiff than her non-disabled co-workers. During this time, Plaintiff would

typically only receive several hours of work per week, while many of her co-workers received full-time schedules.

35. When Plaintiff addressed this disparate treatment with her supervisors, Defendants typically replied to Plaintiff that she "[wasn't] good enough" to handle more cases.

36. One on occasion, on or around March 3, 2017, Plaintiff was assigned to a client who needed a portable commode emptied, and then rinsed out in the sink. Plaintiff completed her tasks, but encountered a clog in the sink. When she mentioned this to the client, the client told Plaintiff that she had "always had plumbing issues." Later during that same visit, the client became enraged, screaming at Plaintiff for allegedly leaving feces in the sink. The client demanded Plaintiff's supervisor's telephone number, and then called Plaintiff's supervisor, screaming that HCA needed to "get that fucking retard out of my house."

37. When Defendants discussed the incident with Plaintiff later that day, they blamed her for the incident, stating that they "[didn't] blame the client for being angry."

38. On another occasion, Plaintiff was working with a client when she began to feel lightheaded and needed to sit down for several minutes, as a result of her POTS. When she did so, Plaintiff explained that she needed to sit down for a moment because of her condition.

39. When Plaintiff returned to Defendants' office, Defendants issued Plaintiff a write-up for doing so. Specifically, Defendant JENKINS stated to Plaintiff at least once that "your mouth's going to get you in trouble" and that "you'd better not talk to any more clients about your personal business."

40. On the contrary, Plaintiff was not "discussing personal business" with her clients, but simply mentioned that she needed to sit for a moment because of her symptoms. Rather than discuss any reasonable accommodation with Plaintiff, Defendants issued her a write-up and threatened her job.

41. On several occasions, HCA would send Plaintiff to clients who were not home or did not answer the door when she arrived. When Plaintiff would call HCA's office to ask how she should proceed, Defendants would become angry with Plaintiff, stating things like "Stop calling this number;" Stop calling and start figuring things out;" and "If you can't [do your job], maybe you can't work here." During these incidents, Defendants would tell Plaintiff that she was not permitted to leave the client's residence until she got permission to do so, which would frequently cause Plaintiff to wait alone for extended periods of time.

42. Upon information and belief, Defendants took such actions in an attempt to convince Plaintiff to voluntarily quit her job, and did not treat non-disabled employees in the same way.

43. On another occasion in late March 2017, Defendants again accused Plaintiff of talking to a client about "personal business." Defendants refused to tell Plaintiff when it had occurred or who had made the claim, but still issued her a write-up, and told her that the company president would "make a decision" about whether to terminate Plaintiff.

44. In early April 2017, Defendants escalated their discrimination against Plaintiff, cutting her hours even further, at times giving her only one hour of work per week. Defendants told Plaintiff that she was getting few hours because of clients complaining about her "every time." However, Defendants again refused to tell Plaintiff anything about who

was supposedly making complaints or what the complaints were about. Furthermore, Plaintiff never directly received *any* complaints from any clients.

45. Throughout this time, Defendants' constant harassment of Plaintiff based on her disability continued on a regular basis.

46. Around August and September 2017, Defendants again cut Plaintiff's hours without warning or explanation. During this time, and continuing through Plaintiff's termination, Defendants only gave Plaintiff approximately 12 or fewer hours of work in a typical week, while Plaintiff's non-disabled coworkers would receive full-time hours.

47. In or around October 2017, Plaintiff needed to take several days off from work to undergo a surgical procedure. When she called Defendants' office to inform them of the planned operation, Defendant AISHA became angry with Plaintiff and told her that "we have to talk."

48. When Plaintiff came into Defendants' offices to meet with AISHA, AISHA stated that Plaintiff was "calling out too much" and that Plaintiff's medical procedure "wasn't an excuse," despite Plaintiff having a doctor's note.

49. Defendants then terminated Plaintiff and required her to sign a document, but refused to provide her with a copy of such or inform her of what she was being made to sign.

50. As a further act of retaliation, around November 17, 2017, Defendants sent Plaintiff's *new* employer a letter that falsely stated that Plaintiff had been terminated for excessive absenteeism.

51. As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

52. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

53. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against the Defendants.

54. The above are just some examples, of some of the sexual discrimination and harassment to which Defendants subjected Plaintiff.

55. Defendants have exhibited a pattern and practice of not only tolerating discrimination and retaliation, but also failing to investigate and cure the wrong once it has been reported.

56. Plaintiff claims alternatively (in the event Defendant claims so or the Court determines) that Plaintiff is an Independent Contractor, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable law for Independent Contractors.

### AS A FIRST CAUSE OF ACTION
### FOR DISCRIMINATION UNDER THE
### AMERICANS WITH DISABILITIES ACT

57. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint

58. Title 42 of the Americans with Disabilities Act of 1990 (Pub. L. 101-336), Chapter 126, Subchapter I, § 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in

regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

59. Defendants engaged in an unlawful discriminatory practice by discriminating against and harassing Plaintiff because of her disabilities.

60. As such, Plaintiff has been damaged as set forth herein.

### AS A SECOND CAUSE OF ACTION FOR RETALIATION UNDER THE AMERICANS WITH DISABILITIES ACT

61. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

62. Title 42 of the Americans with Disabilities Act of 1990 (Pub. L. 101-336), Chapter 126, Subchapter IV, § 12203, states: "(a) Retaliation: No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

63. Defendants engaged in an unlawful discriminatory practice by discriminating against and retaliating against Plaintiff because of Plaintiff's opposition to Defendants' unlawful employment practices.

64. As such, Plaintiff has been damaged as set forth herein.

### AS A THIRD CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

65. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

66. Defendants engaged in outrageous conduct towards Plaintiff with the intention to cause, or with reckless disregard for the probability of causing, Plaintiff to suffer severe emotional distress, and with wanton and reckless disregard for the injurious result to Plaintiff, as set forth herein. The conduct was extreme and outrageous and an abuse of authority and position of Defendants. The above-described conduct was intended to cause severe emotional distress, or was done in conscious disregard of the probability of causing such distress. This conduct exceeded the inherent risks of employment and was not the sort of conduct normally expected from an employer. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has sustained and continues to sustain pain and suffering, extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continues to suffer a loss of earnings and employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, liquidated damages, statutory

damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the

Court deems just and proper.

Dated: Philadelphia, Pennsylvania         **DEREK SMITH LAW GROUP, PLLC**
June 13, 2018         *Attorneys for Plaintiff*

By: _____
Nathaniel N. Peckham, Esq.
1845 Walnut Street, Suite 1601
Philadelphia, Pennsylvania 19103
Tel. (215) 391-4790
nathaniel@dereksmithlaw.com